Your Honor, James Lillenberger on behalf of David Bacon, appellant. I would request five minutes for rebuttal. May it please the Court. I don't think I've ever seen anybody arguing from a laptop before, and I don't know whether we have a rule about that. It's slightly disconcerting, but if you need to go ahead, because we haven't said nothing. I have my notes in here, Your Honor. Selling a firearm to the government is not a crime. 18 U.S.C. 925A says that 922A5 shall not apply with respect to the transportation, shipment, receipt, possession, deportation of any firearm or ammunition reported for, sold, or shipped to, or issued for the use of the United States Marine Department or agency thereof. Agent Ziesemer is an agent of the ATF, is an agent of the government. How do you get around Perry? Well, for one thing, it's not a criminal case. But it was a the felon was a paid government informant. The same argument was made there, and it lost. Well, yes, but it wasn't a – it was a – it was not a criminal case, Your Honor. It was a civil case. So? But the informant was not thought to be the United States. Well – And what you're saying here is that the agent who was working for the United States is the United States. Yes. Whereas in Perry, that wasn't so. Well, Your Honor, I must – Is that your only distinction that it wasn't a criminal case? Well, there's different statutes – or there are different canons of statutory construction that apply. In criminal cases, the rule of lenity applies. And you are not to add words to a statute that aren't there. 925A does not have an exception for undercover agents. And since this is a criminal case and criminal statute, you have to read the statute with lenity, and you can't be adding words to make it easier for the government to collect evidence or to obtain a conviction. If Congress wants – Does 922 – does the A5 cover selling? Well, I think it does, Your Honor, because the word sold is right there in the middle of the statute. Right. And we're talking 925A. The government points to the clause saying transportation, shipment, receipt, possession, or importation. Right. But immediately thereafter is sold or shipped to. And so the transportation is not just transportation. It's transportation as a part of a sale. Certainly, sale is not excluded from the do-not-go-to-jail provision of 925. I think you have to read the whole statute together, and since sold is in the middle of that statute, I don't see how you can segregate transportation from sales. I think that's our first argument, that what the transportation to or the sale of firearms to Agent Zissimer is not a crime for that reason. Secondly, 922A5 itself does not criminalize sales and transfers of firearms to a person who maintains a place of business in the same state in which the transferor resides. And Agent Zissimer's office is in Portland, Oregon. No, no. It says a person who resides or a person is a corporation or other business entity does not maintain a place of business. So here the informant has to be a corporation or other business entity who does not maintain a place of business. Well, it's our position that Agent Zissimer is another business entity. He's in the business of selling his labor for money. That's a business. So everybody's a business. That's right. And he has an office. His office is in Portland, Oregon. Now, if the government wants to avoid this problem in the future, they shouldn't be using Portland, Oregon agents to conduct sting operations in Oregon. They should be importing agents from other states if they want to conduct these sting operations here in Oregon. But the statute is written the way it is. I'm not adding any words. Person is a defined term under the law. I think it's in 921. And a person is defined to include people, corporations, partnerships, et cetera. But there is no definition for other business entity. But it's our position that Agent Zissimer is in the business of selling his labor, and he does so at the Portland ATF office. Therefore, his place of business is in Portland, Oregon, and, therefore, a transfer to him is not illegal. But just about everybody is in the business of selling their labor, and, therefore, just about everybody is going to not be an individual but a business. Yes. Those who are engaged in the labor market. You say that anyone who sells his labor in Oregon maintains a place of business in Oregon. I mean, somebody in New York who's a lawyer who comes out here and appears in this court maintains his place of business in Oregon because he is arguing a case in Oregon. Well, Your Honor, I think we just used the words of the statute, and Agent Zissimer's place of business is the Portland, Oregon, office of the ATF. But there's a difference, I believe, in 922A5 between a resident and a person who is a corporation or other business entity. You don't see that as a difference? I don't, Your Honor. Then why do they use that? Why do they even use if the person is a corporation or other business entity? I don't know, Your Honor. To say it twice because the government likes to do that? Well, Your Honor, we have to start with the definition of person. So your argument is I don't know, but that's it? Well, I guess so. But we do start with the definition of a person in the statute, which defines a person to be an individual, a partnership, a corporation, et cetera. We see that definition used all the time in Internal Revenue Code and in many other government statutes. It's not at all unusual. It's not at all unusual for people to be deemed to be in business. In fact, the vast majority of businesses are done as sole proprietorships. And I don't think anybody would argue that if a person had a gun dealership, which I think is probably what Congress was thinking about, and he was doing business as a sole proprietorship in Fort Morgan but lived in Vancouver, Washington, that a person who sold a firearm to him would be doing something unlawful. Now, if he wasn't a gun dealer and had an FFL, if he were, say, an accountant, but his office was in Portland, Oregon, still his place of business is in Portland, Oregon. And under the terms of the statute as written, an Oregonian could sell a firearm to an Oregon accountant, even if the Oregon accountant happens to live in Vancouver, Washington. Similarly, if an ATF agent does business out of the Portland, Oregon office of the ATF, he's a business entity whose business address is in Oregon. Therefore, these sales were not illegal. Entrapment. The entrapment cases I've read are all involved cases, laws that people of normal understanding would realize were criminal in nature. But this is not one of them. The evidence in this case is that he didn't realize it was a problem. I don't think it is, Your Honor. I think it's very equivalent. He said you better do this or you could get busted. Yes, and he had an explanation of what that meant. It didn't necessarily mean that he believed it was a crime. He thought it meant a person could be hassled. He himself had been hassled because somebody thought he had a firearm in the past. He testified to that event. It was not a crime. But it delayed him. It was inconvenience to him. And he considered that to be busted. But I think what we have to – There's a fairly common slang meaning of what busted means. Well, there is amongst the criminal element, yes. But Mr. Baker is not a member of the criminal element, Your Honor. I mean, the fact that he's at CTAC right now. Prior to this, he had a completely unblemished record. He had numerous character witnesses came in to testify. We had more that were willing to testify, weren't allowed to. All of them, the ones who testified, testified that he was very honest and a man of high quality character. And so we can't – we can't get to him the meanings of the criminal class in terms of their use of vocabulary. But I'd like to focus on the nature of this crime. This is not a crime that people know is a crime. This event, selling a firearm to a person who doesn't live in the same state, is not something a person walking around – I don't understand. That's just an entrapment argument. I mean, he – you're essentially arguing for a knowledge element to the crime that he had in order to commit the crime. He had to know it was illegal. But you're not directly arguing for that construction. So what does it have to do with entrapment? Well, we agree there's a five-factor test. But I believe that when we apply that test, we have to also look at when we have a malprohibitive crime that is not generally known to – that is not generally known to the public. But wasn't it generally known to Mr. Bacon? Didn't he tell Zeisler, don't sell this gun now that you're – now that you're a Washington resident, don't sell this gun to an Oregon resident because you'll get in trouble. Well, he didn't say that. He didn't say, number one, that he knew he was a Washington resident. And, number two, what he said was don't tell other people you got it or where you got it. He didn't say don't sell it. He didn't say I know you're a Washington resident. If he had, he wouldn't be. He did know he was a Washington resident because he told me he was a Washington resident. No, he didn't. Oh, no, he didn't. He had Washington plates, yes. Arguably had a Washington telephone prefix on his phone number. And I thought he told him that he lived in Washington. That's not on the record, Your Honor. He did not. It's not. And we have the auto recordings. At no time did Mr. Zeisler tell Mr. Bacon I'm a Washington resident. More importantly, he didn't tell Mr. Bacon, oh, and by the way, it's a crime to sell this firearm to me. And the reason I think that's important, Your Honor, and I want to give you an analogy because, an example, it is lawful for an Oregonian to go to any Kmart or Walmart in Washington State and purchase a rifle or a shotgun. Oddly enough, an Oregon resident can't purchase a handgun in Washington from an FFL, but any Oregonian can go to any department store and purchase a long gun. Pardon me. At supplemental excerpts of record 154, the transcript of the wire, it says, during their conversation, Zeisler, the informant, expressly told Bacon he lives in Washington. You say it's not on the record? I don't know. That's not in the transcript of what was said. And I've listened to the audio recordings, Your Honor. Well, why don't you check supplemental excerpts of record 154, the transcript of the wire. My notes indicate that it was in there. Okay. Okay. All right. I'll go on. I didn't mean to interrupt you. Well, I did mean to interrupt you, but now you can keep on going. Okay. I don't – however that's characterized, I don't believe that that's what occurred, Your Honor. And if I'm wrong, I apologize. Previously, I do not intend to mislead the Court in any way, shape, matter or form. But I do want to give you an analogy. The analogy is someday the Internal Revenue Service decides it's going to go into the tax return preparation business. And they set up an office, and they have people come in, and they say – and they don't identify themselves as the Internal Revenue Service necessarily, just H and X block. And they have people come in, and then they advise their clients to engage in tax evasion. But they don't tell their clients that they're trying to get them to do tax evasion. They just fill out the tax return forms so as to make their clients engage in tax evasion. And then they turn around and prosecute their clients for signing the forms that they fill out. The question is, as I said before, what the element of the crime is. And I believe in the tax circumstance that the person has to know that they're doing something false or misleading. But if there is no such element of this crime, then I don't see how you backdoor it through the entrapment offense. Well, Your Honor, the reason that we have that exception to the standard for – Well, first of all, is it an element of this crime? I don't remember. I don't remember. I honestly don't either. But the traditional law of criminal law, of course, is that ignorance is no excuse. But the U.S. Supreme Court has made an exception to that general policy or general mantra, and that is in income tax cases, because the income tax laws are so complicated that the government must prove that there is a Which is why your hypothetical doesn't work. Because it's taken care of with that element. But you see, Your Honor, what I'm trying to make my point is that these laws are so complicated, so hard to understand, and really so unknown to the vast majority of people, that that same sort of analysis should be used for an entrapment defense here. New trial. This – everything else that we're arguing about is for pure legal review, pure review, de novo review, with this exception for the new trial. And for this, we admit that we are asking you – we're asking you to say that the district court committed an abuse of discretion. Rarely have I seen a case where the defendant so thoroughly proves his innocence on a particular count. And this is a count about the untruthful ATF form preparation. Hasn't the whole problem come down to whether the witness was slightly wrong at the time? In other words, it isn't – there's nothing wrong with what the witness said, other than he said that they saw him at 9 o'clock and more likely it was 11 o'clock. Other than that, there's nothing that he said that was inconsistent with the record, right? Well, Your Honor, well, actually, there's another thing in it. He said that when he sold the handgun – firearm, it was a rifle. When he sold the rifle to Mr. Bacon, that Mr. Bacon prepared the Oregon State Police form that a dealer is required to fill out when it's accepting a used gun in trade. And that didn't happen either. But the timing is crucial, because he was emphatic. It occurred as soon as the gun show opened at 9 a.m. And the timing was important. The thing is, that's when he's – It's nothing but a credibility issue, right? And it was brought before the jury. There's nothing inherently wrong. There's nothing about whether it happened at 9 versus 11, which would make it impossible for the whole thing to have happened. It's just a credibility question as to whether he was – because he didn't have this fact quite right, maybe he wasn't telling the truth at all. But it didn't make the whole thing impossible. It doesn't make it – you're right. Your Honor, it doesn't make it impossible. But the fact of the matter is, the man can't be trusted. He can't be – I mean – Yes. So it's just a credibility problem, and it was brought out. Well, it was, but then one of the things that was undermined was the significance of the Starbucks receipt. But it was in there. The Starbucks receipt was in there. And the jury can make what they want, and they can believe the guy or not believe the guy. Yes. It's not as if at 11 o'clock – if he was there at 11 o'clock instead of 9 o'clock, then he couldn't have actually sold this gun to the person rather than to his brother. I mean, everything works otherwise except for those two hours. It don't matter. Well, I beg to differ, Your Honor. They do matter because there was another transfer, and it was a transfer between that person and Mr. Ozynski. That's a transfer that occurred at 9 o'clock in the morning. And that was an illegal transfer, not by Mr. Ozynski. Because he was not selling a firearm, but the other guy, the government witness, he was selling a firearm. So? And because he was not selling it to a federally firearms licensed dealer, it was a crime for him to sell it out of his ownership. And all of that came out to the jury, too. Well, yes. But, again, all right, one thing to consider on a new trial that wasn't given to the jury was the affidavit of Mr. Bacon, which was part of his new trial motion. And that was, number one, you know, springing this receipt on us at the end of the day after my testimony and, you know, before closing argument is, A, not fair, but, B, let's see, that when the government argued that it could have been anybody's copy receipt, the affidavit in support of the new trial motion addresses that. Mr. Bacon was the only coffee drinker in the home. His records were segregated from his mother's. And, you know, so the inference that the government asked the jury to draw that they couldn't know whose copy receipt it was wasn't legitimate in light of the new trial affidavit. And so there is something the jury didn't have the benefit of. And because we were blindsided, we weren't given this in pretrial discovery as we should have been, you know, I apologize for not having seen all the ramifications of the stipulated admission of the document. But, frankly, I thought the stipulated admission covered all my bases, and I was surprised by the government's argument. But I believe that Mr. Bacon's affidavit addressed the government's argument and that new trial can be granted based upon the significance that Starbucks received. If you want to reserve any time, you should do it now. I asked for five minutes. Except you already are down to 34 seconds. You've talked through it, counsel. You've got 34 seconds. All right. Well, I don't want to dismiss the significance of my constitutional arguments because I believe that they're extremely important. The argument based upon the export clause is being made for the first time to my knowledge. I don't believe any appellate court has ever addressed it, certainly not since Brady v. Merlin. The law is quite clear that the export clause deals as one would expect with exports, i.e., things leaving the country. Well, that wasn't Justice Marshall's opinion, Your Honor. Well, it does seem to me that it was Justice Marshall's opinion, actually, Justice Marshall, because that was a license with regard to things leaving the country. Well, Your Honor, he specifically said that it was things being sent from the State. From the State out of the country. I don't believe that's what he said, Your Honor. And I'm looking strictly at the Merlin. I looked at it also, and it's how I read it. Brown v. Merlin. Okay. You're now over time. Thank you. All right. May it please the Court. My name is Amy Potter, and I represent the government in this appeal. There are a variety of issues raised in this appeal, and I'm going to turn first to the last issue, or the second-to-last issue raised by my opposing counsel, which is the motion for a new trial. There was an allegation made that he was blindsided by the Starbucks receipt, and I think it was that he was not given this in pretrial discovery. What occurred in pretrial discovery was, wasn't there some later recognition that that wasn't in the pre-trial discovery or some allegation at least that it wasn't? There was. I think it was in the second motion for reconsideration of this issue. There were three. This motion for retrial was raised three separate times before the district court denied every single time. The issue was bags of evidence were collected from the floor of the defendant's home at the time of the execution of the search warrant. That evidence was copied. It does not appear that the Starbucks receipt was part of those copies, but in addition to that, all of that evidence was made available to the defendant to review, and he, in fact, went and reviewed some of the evidence but never reviewed this particular bag. The government was not given any notice of an alibi defense. Once it became clear at trial during the defendant's testimony that there was an alibi defense, the government itself went back through all of the evidence. At that point, the Starbucks receipt was discovered, and as soon as it was discovered by the government, it was turned over to the defense. At that time, the defense was given the opportunity to present it in any way it wished. It could call another witness. We had given them ample time. The decision was made to enter into a stipulation. The government allowed that stipulation and then argued at closing that they did not know whose coffee receipt it was. It wasn't until the affidavit, which I believe, as I said, was with the second or third motion for reconsideration of this issue, that the allegation was made that Mr. Bacon was the only person who drank coffee. Of course, putting all of this aside, the issue of the time is not an element of the offense, and I think that this is the key issue here. The question is whether the 4473 ATF forms that were filled out accurately reflect the transactions that occurred at the gun show. The jury, which heard from Scott Carey, and heard not only that he thought it was about 9 o'clock when the transaction occurred, but that he didn't wear a watch, and that it was all a guess as to when the time was, they could believe that he filled out the forms and believe that he had legitimately transferred the firearms onto the books of an FFL. They could disbelieve defendant's story that, in fact, he transferred all these guns to his brother, and the transaction with Scott Carey occurred after the close of the gun show off the books. Indeed, Mr. Carey not only testified that in this occasion he used the proper paperwork, but later, when he transferred the gun at a different gun show, he spent extra money to ensure that all the paperwork was properly done, and the government offered all of that paperwork into evidence. What is the question? This is just one count. There were, what, five or six others? There were five other counts, six total. How did this contribute to the sentence, if at all? He received concurrent sentences on all of the counts, so it did not impact his sentence. I mean, certainly it was a count. But each sentence, each count received 15 months, so it did not impact his overall sentence. So, again, this was a credibility issue for the jury. The jury heard the evidence. The defendant presented the evidence that he was wrong about the time, and this issue of perhaps another transaction was illegal, even though there's no evidence that he did, in fact, commit an illegal firearms transaction. The jury disregarded that and found defendant guilty. The trial court reevaluated this issue three times in face of all these allegations. The trial court's decision not to grant a motion for a new trial was not an abuse of discretion. Another issue that defendant has raised is the entrapment issue. In order to be entitled to an entrapment instruction, he had to make a showing of slight evidence that he was either induced and that he had no predisposition to commit the crime. As the district court properly found, he offered no such evidence. As I believe that the ---- What is, is there a, what is the mens rea for this crime? We had to prove that he willfully sold a firearm knowing or had reason, having reason to know that the agent did not reside in the same state that he resided. So there was a willful element, and the jury found that he had willfully done this. And indeed, the, I think it was slightly misrepresented what is contained in these tapes, telephone calls and then tapes of the transactions. As noted, on SCR 154, the very first transaction at the gun show, it shows the agent and Mr. Bacon, the defendant, discussing it, and the agent says, I live in the State of Washington. Then ---- And at some other point, he said, I have to go buy my house in Vancouver. Yes. And then when, at that gun show, the defendant gives the agent his number and says, if you want to buy guns later, give me a call. The agent calls him. So all that the agent did was call him and attempt to purchase things that the defendant had already made clear he was ready and willing to sell. During that conversation, the agent left him a number with a Washington prefix. Well, that can be a cell phone with a Washington prefix. Definitely. Said he had a Washington license plate and said, I'm going to buy my home in Vancouver. And in terms of the rest of that conversation, he not only tells the agent, don't tell them you bought this in Oregon or you'll get busted. He then goes on to say, tell them you bought it in Vancouver. And then he goes on to say, just so you know, buying a gun out of State can get you busted. Now, granted, there is an explanation for what busted meant. However, I think it was fair for the jury to infer that busted in this sense, especially when we're talking about buying out of State, indicated knowledge on the defendant's part. And it should be noted that throughout the trial, it was clear that the defendant had been engaged in working for an FFL at certain parts of this case and had had a long history of selling firearms and was quite familiar with this. The defendant simply made no showing that he was induced by the government and had no predisposition to commit this crime. All the government did was give him the opportunity to sell guns he was ready and willing to sell. There were no threats. There were no coercion. Indeed, it was the defendant who suggested that the agent meet him in Oregon and then told him to lie about where he had purchased the gun. In terms of selling a firearm to the government is not illegal. I do believe Perry precludes the ruling that that applies to undercover agents. Kagan. What about the fact that the statute has an exception for transportation, et cetera, et cetera, but not for selling? What the statute says is it does not – it applies to transportation of goods sold to the government. So there is – the word sale is in there. However, it doesn't – it talks about transporting or delivering items that are sold to the government. It doesn't appear to apply to plain old sales to the government. I agree that that seems to be odd, an odd wording of – But it also seems to be purposeful in the sense that the rest of the statute does apply to selling. It does. Again, no court has ever interpreted that way. I did note for the court, the Fifth Circuit's admonishment that it perhaps didn't apply to sales, but then the Fifth Circuit went on in that case to decide regardless it doesn't apply to undercover sales. In order for that exception to apply, it's clear that the seller or transporter needs to know they're delivering to a government agent. Indeed, defendants' interpretation would basically wipe out all undercover operations in any gun sales throughout the country. That may be, and that's not – you know, then they can amend the statute. I mean, it is a little peculiar. We have the Perry case. But if, in fact, there's an exception for selling to the government, which I don't know that there is, maybe that's why there isn't, in fact. Correct. But if it did apply, if it literally applied, I don't know why it would matter what the defendant thought. In other words, I don't know why it would matter that he didn't think he was selling to the government. If he was selling to the government, there's an exception for selling to the government. Literally speaking, there doesn't seem to be an exception for selling to the government. No. Literally under the statute, there does not appear to be an exception for selling, so that could have been Congress's intention. However, I do believe that Congress's intention in that was to allow people to sell to government agency – or to transport to government agencies guns that had been purchased, not to exempt undercover operations. And as noted, Perry, I think, does apply here, even though it was in the civil context. In terms of the statutory interpretation of 925A, that Agent Ziesmer, because he had a place of business, meaning an office with the ATF here in Oregon, he is, in fact, a resident of the State of Oregon. I think that flies in the face of the clearly written statute that says only if a person is a corporation or business entity does the place of business. It is a little peculiar, though. What if he was a sole practitioner, a sole lawyer, accountant, computer consultant or something? It wasn't really an entity. It was a person who, you know, worked out of his house as a consultant. Would that count? If he worked out of his home, he would likely be a resident of that state. However, I believe that if, for example, a lawyer was a solo practitioner in Portland but lived in Vancouver, Washington, he would be considered a resident of Vancouver, Washington, and thus would be prohibited from buying a gun in Oregon from a non-FFL. He would be required to abide by the laws of Washington in terms of guns he purchased. If he bought it under the name of, you know, Joe Smith Esquire, would that be different? If he bought it for, if a corporation purchased it for. . . No, he wasn't a corporation, but it was. . . A solo practitioner. Joe Smith Esquire, i.e. in his business, with his business hat on. Law offices of Joe Smith. The law offices would then have to keep it in the State of Oregon. I don't think he could be transporting it to Washington, but he certainly couldn't buy it for his personal use in Oregon. But, yes, I believe it's possible that the corporation itself or the solo business entity could buy the gun. But here we don't have agencies who are acting as this business entity. He was acting as a private citizen in an undercover capacity, but he had never made any representations that he was buying it for his Oregon business. Every representation, every indication he gave was that he was living in Washington. One thing that hasn't been mentioned here is that there were some Second Amendment arguments, and we know the Supreme Court has a Second Amendment case. We know that under our law at this point, he obviously loses. And I'm assuming we just decided under our law, and if he wants to go to the Supreme Court, he can go to the Supreme Court. Is there anything else that we should be doing with him? Not under the Second Amendment. I don't believe that the Parker case before the Supreme Court is going to preclude regulations on transfers between states. But, again, I think the current law is clear that he loses on the Second Amendment, and if he wishes to take it to the Supreme Court, he certainly can. And if the Supreme Court wishes to hear it and overturn that Second Amendment jurisprudence. But at this point, there's nothing that indicates that this particular statute is going to be struck down under the Second Amendment. There are a host of other constitutional arguments that have been briefed. I believe they're all precluded by either current Supreme Court or Ninth Circuit law. I'm happy to answer any additional questions the Court has. Thank you. Thank you very much, counsel. We'll give you about a minute. There may have been a gun show at the gun show in Vancouver that agents Eisner lived in Washington. But that gun show was over a month and a half before the first sale. And the evidence was that Mr. Bacon did not remember that conversation. And even Agent Eisner said he did nothing to make himself remarkable or do anything to make Mr. Bacon remember him. I'm a little baffled about why you're putting all this effort into this. I mean, isn't the likelihood that he already has five convictions. Now he has six. He would go back and get the same sentence. Why are you putting so much effort into this issue? Well, for one thing, it's morally appropriate. There's tremendous moral opprobrium associated with a false statement conviction of any kind. My client, of course, knows he didn't make a false statement. And there's a moral reason for this, for one thing, even if there's not a practical reason. But we also believe that whether here or beyond, we will prevail on the sales accounts. And, therefore, it's essential that we also address the – now, if I might, one last thing. Yeah, we're actually done. So thank you very much. Thank you, counsel. The case of United States v. Bacon is submitted and we are recessed for the day. Thank you.
judges: Fernandez, Berzon, Bea